Filed 5/17/21  P. v. Pryor CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GERRALLE PRYOR,<br><br>    Defendant and Appellant. | H046634<br>(Santa Clara County<br>Super. Ct. No. 215007) |

Defendant Gerralle Pryor and his codefendants[1] were found guilty of several offenses connected with a home invasion robbery in Los Altos Hills.  The trial court sentenced Pryor to a total term of 28 years four months in prison.

On appeal, Pryor argues the trial court erred by:  (1) admitting certain gang-related evidence; and (2) denying his motions for a mistrial.  We find no error and will affirm the judgment.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Procedural Background*

On October 1, 2015, the Santa Clara County District Attorney filed an indictment against Pryor and three codefendants.  The indictment charged Pryor with conspiracy to commit a home invasion robbery (Pen. Code, §§ 182, subd. (a)(1), 211,

---

[1] Pryor's codefendants—Jereme Jermaine Brown, Icasiano Obana, and Christina Navarro—are not parties to this appeal.  Pryor was tried along with Brown and Obana. The record does not contain information about the resolution of Navarro's case.

213, subd. (a)(1)(A); count 1);[2] participation in a criminal street gang (§ 186.22, subd. (a); count 2); attempted home invasion robbery in concert (§§ 664, 211, 213, subd. (a)(1)(A); count 3); three counts of home invasion robbery in concert (§§ 211, 213, subd. (a)(1)(A); counts 4, 5, 9); two counts of kidnapping for robbery (§ 209, subd. (b)(1); counts 6, 10); and assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(4); count 7).  As to counts 1, 3, 4, 5, 6, 7, 9, and 10 the indictment alleged that Pryor committed these offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)(1), (b)(4), (b)(5)).  As to counts 4, 5, 6, 9, and 10 the indictment alleged that Pryor was a principal in the offenses in which one principal personally used a firearm (§ 12022.53, subds. (b), (e)(1)).

The trial court granted Pryor and Brown's joint motion to dismiss counts 3 through 8 on the grounds that Santa Clara County was not the proper venue and dismissed count 10 pursuant to Pryor's section 995 motion.  Pryor proceeded to trial on the three remaining counts alleged against him (counts 1, 2, 9).[3]

The jury found Pryor guilty on the three remaining charges: conspiracy to commit a home invasion robbery (§ 182, subd. (a)(1); count 1); participation in a criminal street gang (§ 186.22, subd. (a); count 2); and home invasion robbery in concert (§§ 211, 213, subd. (a)(1)(A); count 9).  After the jury was unable to reach a verdict on the firearm and gang enhancement allegations, the trial court declared a mistrial on those allegations.

On October 17, 2018, the district attorney filed a first amended indictment adding allegations that Pryor had suffered a prior strike conviction (§§ 667, subd. (b)-(i), 1170.12) and a prior serious felony conviction (§§ 667, subd. (a), 1192.7).  Pursuant to a negotiated disposition, Pryor admitted the prior strike and prior serious felony allegations

---

[2] Unspecified statutory references are to the Penal Code.

[3] The charges were presented to the jury as counts 1, 2, and 3—with count 3 in place of count 9—to prevent jurors from speculating as to why certain counts were missing.

in the first amended indictment in exchange for dismissal of the firearm and gang enhancement allegations as well as the district attorney's agreement not to allege a second prior strike conviction.

On December 14, 2018, the trial court denied Pryor's *Romero*[4] motion and sentenced him to a total term of 28 years four months in state prison, consisting of the aggravated term of 18 years (nine years doubled due to the prior strike) on count 1, a consecutive term of one year four months (one-third the middle term, doubled) on count 2, a consecutive term of four years (one-third the middle term, doubled) on count 9, and a consecutive five year term for Pryor's prior serious felony conviction.[5] The trial court awarded Pryor 1,313 days of custody credits plus 196 days of conduct credits under section 2933.1, for total credits of 1,509 days. As to fines and fees, the trial court imposed a restitution fund fine of $300 (§ 1202.4, subd. (b)); an additional $300 parole revocation fine (suspended) (§ 1202.45); a $120 court security fee (§ 1465.8); a $90 criminal conviction assessment (Gov. Code, § 70373); a $259.50 criminal justice administration fee payable to Santa Clara County (Gov. Code, §§ 29550, 29550.1, 29550.2); and a $10 crime prevention fund fine plus $31 penalty assessment (§ 1202.5).

Pryor timely appealed.

---

[4] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

[5] Before the court pronounced sentence, the district attorney advised that pursuant to Senate Bill No. 1393, effective January 1, 2019, the trial court would have the discretion under section 1385 to dismiss prior serious felony conviction enhancements imposed under section 667, subdivision (a). The trial court subsequently stated that "if the Court had discretion . . . under the . . . interest of justice, I do not believe it would be appropriate to strike the punishment for" the prior serious felony conviction.

## B. Evidence Presented at Trial

### 1. The Prosecution Case

#### a. Los Altos Hills Robbery and Pryor's Arrest in Oakland

A.W. testified that, on May 11, 2015, he was alone at his parents' home in Los Altos Hills. Around 11:00 a.m., A.W. was downstairs in his bedroom when someone either rang the doorbell or knocked on the front door. A.W. looked outside and saw a young "Hispanic" man dressed in baggy clothing. He assumed the man was a laborer from a construction project down the street. When he opened the door, A.W. got a better look at the man and saw he was wearing jeans, which had a distinctive gold chain and trinket attached to them, and a hoodie. The man pulled out a black handgun and told A.W. to get on the floor.

A.W. complied, and he heard the man say, "Come over" to someone on his phone. The man asked A.W., " 'Where's the safe?' " A.W. told him there was no safe, and that no one else was home. A second man, who A.W. described as a "young African-American" and a "little shorter, a little skinnier" than the first man, entered the house. A.W. told the men that they could take whatever they wanted, but there was no safe in the house.

A.W. got up and the men followed him into his mother's bedroom. They began rummaging through the drawers and her clothing. As they did so, they repeatedly asked A.W. where the safe was, saying " 'This is an inside job . . . [w]e know there's a safe.' " After searching through his mother's bedroom, the second man said, " 'Get the other guy in here. This guy needs to know we're serious. The other guy will make him know we're serious.' " The first man was constantly on his phone, saying " 'Are you there? Are you there?' "

The men placed a pillowcase over A.W.'s head and led him downstairs where there were additional bedrooms. Along the way, the men grabbed a laptop bag which belonged to A.W.'s cousin.

4

In A.W.'s bedroom, they took A.W.'s cellphone from his desk and rummaged through drawers as well. The men told him to get into the closet, but when A.W. said he would not fit, they ordered him to sit on the floor of his room. A.W. heard them go upstairs, and once he realized they had left the house, he called 911.

As A.W. was on the phone with the dispatcher, the Hispanic man returned and knocked on the door. A.W. could see him through the glass by the door and the man appeared aggravated that the door was locked. He began pounding on the door, demanding that A.W. open it. A.W. ran downstairs again and he heard the front door being "kick[ed] open." A.W. ran out to the backyard and headed toward a nearby friend's house.

On the way, A.W. saw a gray Nissan SUV parked in front of a neighbor's house, diagonal to his parents' house. A.W. could see a man standing by the SUV but, without his glasses, he could not determine the man's race or other features.

Santa Clara County (SCC) Sheriff's Deputy Christopher Scott responded to A.W.'s 911 call. Dispatch had informed him that the suspects included a black male and a "possible Hispanic male." As Scott approached the residence in his patrol vehicle, he saw a gray SUV driving towards him away from the residence. Scott could see the driver was a black male and he observed that the vehicle had out-of-state license plates. As Scott made a U-turn, he saw the SUV speed away. Scott pursued the SUV, reporting to other officers that the vehicle was headed toward Interstate 280 (I-280) on Foothill Boulevard, but he eventually lost sight of it.

SCC Sheriff's Deputy Travis Welch testified that he was responding to the 911 call on his patrol motorcycle when he heard Scott report the suspect vehicle's route. Welch was near the juncture of Foothill Boulevard and I-280, so he pulled over to intercept the SUV. He saw a silver SUV with an out-of-state license plate driving toward his location at a high rate of speed on southbound Foothill Boulevard. As it reached his position, the SUV crossed into the northbound lanes—into oncoming traffic—and took

5

the exit to I-280 south.  By the time Welch was able to get onto southbound I-280, the SUV was out of sight.

Oakland Police Department (OPD) Sergeant Frederick Shavies testified that he was the supervisor of OPD's gang unit and was qualified to testify as an expert in criminal street gangs in Oakland, specifically a gang known as "ENT."  In May 2015, Shavies had been contacted by officers in the Newark Police Department about a home invasion robbery that took place on May 2, 2015, in Newark.  When Newark police officers showed Shavies a surveillance video associated with that robbery, Shavies recognized Pryor as one of the suspects.  Shavies obtained a search warrant to track a cellphone number associated with Pryor using GPS and they began tracking that number on May 10 or 11.

On May 11, 2015, Shavies saw that the number OPD was tracking was in Palo Alto, so he contacted the Palo Alto Police Department to see if any burglaries or home invasion robberies had been reported.  The Palo Alto police directed Shavies to the SCC Sheriff's Department which informed him that a home invasion robbery had just taken place, involving three suspects, black and Hispanic, driving a silver SUV.   Based on the GPS updates, Shavies could see that the number associated with Pryor was moving toward Oakland and eventually stopped at a location on International Boulevard.

Shavies and other officers drove to that location and Shavies observed a silver SUV parked outside of a pawnshop.  Shavies saw Pryor standing outside of the pawnshop, looking both directions on International Boulevard, and Shavies could also see at least two other individuals inside the business.  At that point, Shavies directed the arrest team to detain Pryor and the others.  Pryor ran but was taken into custody.  Obana and Brown were arrested inside the pawnshop.  When he was arrested, Brown had "a very distinctive gold grill on the upper teeth" and the keys to the silver SUV were in his

6

pocket.[6] Shavies called the SCC Sheriff's Department at around 2:00 p.m. and advised them that OPD had detained three suspects from the Los Altos Hills robbery.

That evening, SCC sheriff's deputies drove A.W. to OPD to view potential suspects. A.W. identified Obana, with a confidence level of 90 to 100 percent, in part because of the distinctive gold trinket attached to his jeans.[7] He identified Pryor as the second man who entered the house but A.W. was only 80 percent confident in that identification. Police showed him a third man (Brown) as well, but A.W. could not identify him as one of the people at his house that day.

Police also showed A.W. the various pieces of jewelry and other property recovered from the silver SUV. A.W. identified his cousin's laptop bag, his cellphone case, several pieces of his mother's jewelry, and some "small coins that looked familiar as well."

A.W.'s mother, S.C., testified that she was at work on May 11, 2015, when she was called by the police about a robbery at her home. She was not allowed to enter her home until about 7:00 p.m. and when she did so, S.C. saw that her bedroom had been ransacked. Jewelry which she kept in a drawer in her walk-in closet had been taken. As S.C. was straightening up in her closet, she discovered a handgun underneath some clothing that had been thrown on the floor. S.C. turned the weapon over to the police, who had not yet left the scene. The firearm was a Glock model 23 with an extended magazine. The handgun was fully loaded, with 22 rounds of .40-caliber bullets in the magazine, and a 23rd bullet in the chamber.

---

[6] Police recovered over 100 items from inside the SUV, including many pieces of jewelry, two cellphones, a laptop bag, a plastic bag containing 37 rounds of .40-caliber ammunition, a tool used to break windows, silver and gold collectible coins, purses, and clothing including several pairs of jeans and at least two hoodies.

[7] At trial, A.W. identified Obana as the first man who entered his parents' home, carrying the firearm.

The following day, S.C. was taken to the police department to look at some jewelry and she identified all the jewelry she was shown as hers.  More than half of it had been damaged, with precious stones missing, and those stones were never recovered.  S.C. testified the jewelry was worth more than $100,000.

### b.  Prior Uncharged Conduct

#### i.        2015 Home Invasion Robbery in Newark

Around 10:30 p.m. on May 2, 2015, C.N. (wife) and D.N. (husband) were asleep in the bedroom of their home in Newark when wife was awakened by someone opening the door to their bedroom and shining a flashlight inside.  She woke up husband and told him to call 911.  Wife jumped out of bed and tried to push the door closed as someone pushed against it on the other side, demanding that she open the door.  Three men broke the door, entered the bedroom, and the man holding a flashlight forced wife to the floor.  Wife saw that one of the other men had a gun, and husband testified that man hit him in the face, head, and arm with the gun and pushed him to the floor.  Husband was bleeding "from the nose and from [the] right side of [his] eye[]."  He described the gun as having a "longer than the normal carousel"[8] placed in the handle of the gun.

Wife saw that the man with a gun was wearing a belt with a distinctive designer buckle.  Both the man with the flashlight and the man with the gun were black.  Husband described the man with the gun as the tallest of the three men and he also had "some gold teeth."  Neither wife nor husband clearly saw the third man, though wife saw that he was holding the purse she had left on her kitchen counter.

The man with the gun told wife to stand up and, pressing the weapon against her forehead, asked her and husband where the jewels and cash were.  Wife did not say anything, but husband told the men they had no money or jewelry.  Wife saw the third man had taken her jewelry box from her nightstand and dumped its contents on the bed.

---

[8] Husband admitted he was not familiar with guns and believed the part of a gun where the bullets were placed was called a "carousel."

8

The man with the gun was holding a phone in his other hand, and wife could hear a woman's voice telling the men to get out.

The men then began to push wife and husband into the hallway and into an adjoining bathroom. Husband told wife in Vietnamese not to go into the bathroom and to try to push their way out. When they resisted, the men ran out of the house, taking some of wife's costume jewelry, $1,000 in cash, credit cards, and wife's driver's license. Husband called the police.

In investigating the robbery, Newark police viewed surveillance videos recorded on the evening of May 2, 2015, at a different home in Newark within three miles of the victims' home. The videos showed three men and a woman, with the woman knocking on the front door, and the men moving through the backyard and driveway. Newark officers showed still images from these videos to wife and husband, and they identified two of the men who robbed them—the man carrying the gun and the man carrying the flashlight—from those images. After the Newark Police Department transmitted the images to nearby police departments, OPD contacted them and identified Pryor as one of the men in the photos.

On May 14, 2015, husband and wife were brought to the Santa Rita Jail for separate live lineups. Wife identified Brown as the man with the gun but was unable to identify Pryor in the lineups she was shown. Husband identified Pryor in the lineup he was shown, but the police officer was not entirely comfortable with husband's identification because he indicated it was based in part on the prior photos of Pryor he had seen.

During the trial, wife and husband made in-court identifications of Brown as the gunman and Pryor as the man with the flashlight.

### ii. 2012 Home Invasion Robbery in Oakland

OPD Officer Nancy Cerecedes testified that, on January 31, 2012, at around 10:30 a.m., she responded to a report of a home invasion robbery in Oakland. When she

9

arrived on scene, Cerecedes met with the victims who reported two people entered their home and robbed them. One of the robbers left a cellphone behind and the screen of that phone was a photo of a black male, 17 to 20 years old, with gold teeth. The man was wearing a baseball cap, a blue shirt, and was displaying money in his hand. The "screen saver read 'Stubby ENT.' " When Cerecedes showed the photo to OPD Officer Chris Marie,[9] he recognized that it was a picture of Brown. According to Marie, the phrase " 'Stubby ENT' " in the photo was a reference to the ENT criminal street gang.

### c. *Gang Testimony*[10]

Marie testified that ENT originally went by the name "Money Team" but transitioned to the name ENT in 2009 or 2010. Beginning in 2009, Marie had numerous contacts with Pryor and often saw him "hanging out in certain neighborhoods" in East Oakland that Marie knew were ENT territories. While Marie would still consider those neighborhoods ENT territory, that designation is "not as relevant as it was back in 2009/2010" because unlike some other gangs, what constitutes ENT territory is "fluid."

OPD Detective Daniel Bruce testified as an expert in criminal street gangs, specifically ENT and a rival gang called Case Boys. Over the years, Bruce had investigated hundreds of crimes committed by ENT and occasionally used wiretaps to listen in on their internal communications.

According to Bruce, ENT began with "10 to 12" people who were "a small core group of friends some of whom were relatives." The group expanded by bringing in other friends or relatives but "really to get into the gang you had 'to put in work,' " meaning commit crimes with other gang members. Some people have no ties to ENT and do not commit crimes with ENT members but simply claim ENT "just for notoriety or

---

[9] Marie also testified as both a percipient witness and as an expert "in criminal street gangs, specifically ENT."

[10] Additional facts will be recounted in the discussion as relevant to Pryor's contentions on appeal.

status primarily on social media." For the most part, ENT members generally "get along" with people who just claim ENT. Compared to Case Boys, which has laws and requires members to swear an oath, ENT is much less formal.

ENT is associated with specific tattoos, including "ENT," "Stubby," and "Money Team" as well as numerous hand signs, but they do not claim a particular color. Bruce testified "Stubby" was originally the nickname of Edward Hampton. When Hampton and Nario Jackson were killed in November 2010, their first initials, "E" and "N," were used to form the name "ENT," with the "T" originally standing for "team." Another member, Martin Flenaugh, nicknamed "Taliban," was killed in 2011 and now the "T" in ENT is used to memorialize him.

Based on Bruce's investigations, the "primary criminal activities of the ENT street gang are burglaries, home invasions, street robberies, shootings to include ones that have victims the ones that don't [*sic*]; murders, fraud, [and] prostitution." ENT will generally target "Asian and . . . Indian" victims for their home invasions. Bruce testified that in his investigations, ENT members commonly use "[h]andguns with extended magazines and assault weapons" when committing crimes.

According to Bruce, ENT members gain respect within the gang by committing crimes that will promote its image and instill fear in rival gangs. Members use social media to "flaunt[] the proceeds of the crimes" which can include the stolen items themselves or high-value items they have purchased using those proceeds. ENT members also create music videos which are posted to social media in which they promote their wealth and willingness to use violence. The videos also serve as a recruitment tool.

Bruce identified People's exhibit 37 as Brown's prior conviction on January 31, 2012, for first degree residential burglary with the use of a deadly weapon. Bruce was familiar with the facts of that conviction and had personally observed Brown in areas that were associated with ENT. Based on those facts, plus the fact that a cellphone was left at

11

the scene with Brown's photo as the screensaver and the words "Stubby ENT" written across it, Bruce opined that Brown was a member of ENT.

Bruce also testified that Ronnie Flenaugh, De Angelo Austin, Frederick Manning, and Brian Clark are members of ENT based on their convictions for various offenses, including home invasion robberies, their social media posts, and his personal encounters with and investigations of those individuals. Austin, Manning, and Clark also sport various ENT tattoos.

Bruce testified he has known Pryor since 2009, has had numerous in-person contacts with him, listened to his phone calls, watched his rap videos, viewed his social media posts, and on one occasion, stopped Pryor while he was driving a Maserati.[11] Based on Pryor's admissions and social media posts, Bruce learned that Pryor's gang moniker is "Lil SF."

In his role as a gang expert, Shavies testified he had investigated more than 30 cases involving ENT. He has known Pryor, whose gang moniker is "SF" or "Scarface," since 2008. Shavies has seen rap videos featuring Pryor in which he refers to himself as SF or "Little SF."

Shavies was familiar with Brown from the incident in which Martin Flenaugh had been killed by an OPD officer. Shavies was involved in the investigation of that case and testified that Brown was in the car with Flenaugh. Officers heard gunshots and observed Flenaugh's vehicle speeding away from the scene. During the pursuit, the vehicle crashed and "then a shooting incident occurred." Brown was arrested.

Shavies also had many personal contacts with Flenaugh's brother, Ronnie, through police pursuits, arrests, and investigations. Shavies opined that Ronnie Flenaugh was an ENT member based on ENT writings seized from his residence and his conviction for a 2012 home invasion robbery with personal use of a firearm.

---

[11] A picture of Pryor posing by that same Maserati and flashing an ENT gang sign was introduced into evidence.

## 2. *The Defense Case*

Pryor and the other codefendants presented no evidence.

## II. DISCUSSION

### A. *Admission of Gang Evidence*

Pryor argues the trial court violated his due process and fair trial rights by permitting the introduction of inflammatory and prejudicial gang evidence that was not relevant to the charges in this case. Specifically, Pryor claims the trial court erred by admitting the following portions of Bruce's testimony: (1) that ENT was an ally of an Oakland gang known as "Ghost Town"; (2) that a gang member who shoots and kills a rival gang member bolsters his own status within the gang and the gang's reputation as a whole; (3) that Bruce personally investigated cases involving "shooting and murder . . . committed by or against ENT and [its rival] Case Boys gang members"; and (4) that Bruce "[knew] of persons who have been shot at after it was alleged they snitched." Alternatively, Pryor contends this testimony should have been excluded under Evidence Code section 352 as it was more prejudicial than probative. Finally, Pryor argues the testimony rendered his trial fundamentally unfair, violating his federal due process rights. We disagree on all counts.

### 1. *Disputed Gang Testimony*

During trial, Obana's counsel, joined by Brown's counsel, objected to Bruce testifying about gangs other than ENT and a rival gang, Case Boys. Pryor's counsel did not join the objection. The trial court ruled that Bruce could "give opinions with respect to criminal street gangs, specifically ENT and Case Boys," but with respect to Bruce testifying about other gangs, "it would have to be determined to be relevant on the particular question basis."

Over relevance and Evidence Code section 352 objections, Bruce testified he was aware of and had personally investigated specific acts of hostility between ENT and Case Boys. The prosecutor asked what type of crimes were involved, and after the trial court

13

again overruled counsel's relevance and Evidence Code section 352 objections, Bruce testified that he "took part in a shooting and murder investigations [*sic*] involving crimes committed by or against ENT and Case Boys gang members." Bruce also testified that "[i]f one person were to do a shooting that killed a rival gang member, that one person would then be bolstered within the gang and that gang's reputation would be bolstered by that shooting as the murder of a rival gang member would be a victory."

The prosecution asked Bruce if he was "aware of any alliances between ENT and other gangs in Oakland" at which point Pryor's counsel raised relevance and Evidence Code section 352 objections. The trial court overruled the objections and Bruce testified that ENT's "main alliance . . . even involv[ing] cross-membership" is with a gang known as Ghost Town.

The prosecution inquired whether "snitching . . . is looked down upon" within ENT and "what happens to someone if they snitch." The trial court again overruled counsel's relevance and Evidence Code section 352 objections, and Bruce responded that he knew of "persons who have been shot at after it was alleged that they snitched," but that he also knew of "people who have been just talked poorly of" on social media.

### 2. *Applicable Legal Principles*

"Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative." (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192.) Evidence Code section 210 defines "relevant evidence" as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact *that is of consequence to the determination of the action.*" (Italics added.) The test of relevance is whether the evidence tends logically, naturally, and by reasonable inference to establish material facts such as identity, intent, or motive. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1058.) "Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols,

*beliefs and practices*, criminal enterprises, *rivalries*, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*), italics added.)

Under Evidence Code section 352, a trial court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) " 'In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.' " (*People v. Branch* (2001) 91 Cal.App.4th 274, 286.) "California courts have long recognized the potentially prejudicial effect of gang membership." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223 (*Albarran*).)

Generally, the trial court's ruling to admit or exclude expert testimony under Evidence Code section 352 is reviewed for an abuse of discretion. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.) Erroneous admission of evidence that is unduly prejudicial under that statute requires reversal of the judgment only if it is reasonably probable that the defendant would have received a more favorable verdict absent the error. (*People v. Partida* (2005) 37 Cal.4th 428, 439 (*Partida*); *People v. Watson* (1956) 46 Cal.2d 818.)

A party may raise a due process claim for the first time on appeal when that claim "do[es] not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert[s] that the trial court's act or omission, insofar as it was

15

wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the federal Constitution." (*People v. Avila* (2006) 38 Cal.4th 491, 527, fn. 22.) So long as "the trial objection fairly informs the court of the analysis it is asked to undertake," the objecting party need not "inform the court that it believes error in overruling the actual objection would violate due process." (*Partida*, *supra*, 37 Cal.4th at p. 437.) However, a defendant must still "show that the admission of the evidence was erroneous, and that the error was so prejudicial that it rendered his trial fundamentally unfair" in order "[t]o prevail on [an] argument that he was denied a fair trial and due process of law by the admission of gang evidence." (*People v. Garcia* (2008) 168 Cal.App.4th 261, 275.)

Even assuming the trial court erred in admitting evidence, the defendant must still show that he was prejudiced thereby. "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*Partida*, *supra*, 37 Cal.4th at p. 439; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.) Erroneous admission of evidence results in an unfair trial " '[o]nly if there are no permissible inferences the jury may draw from the evidence,' " and " '[e]ven then, the evidence must "be of such quality as necessarily prevents a fair trial." ' " (*Albarran*, *supra*, 149 Cal.App.4th at p. 229.)

### 3. *Admission of Challenged Evidence Was Not An Abuse of Discretion*

The testimony offered by Bruce regarding how ENT treated rivals and informants was relevant to the issues presented in this case because it provided the jury with information about ENT, specifically its "beliefs and practices" as well as its "rivalries," thereby informing the jury's decision about whether it was, in fact, a criminal street gang. (*Hernandez*, *supra*, 33 Cal.4th at p. 1049.) Although this case did not involve a shooting between ENT and a rival gang or retaliation against a supposed informant, the testimony tended to show that ENT had the violent characteristics associated with criminal street

16

gangs. While Bruce (and the other gang experts who testified) may have offered other specific evidence sufficient to establish that ENT was a gang within the meaning of section 186.22, that does not render irrelevant all *additional* evidence tending to prove that material fact, and the trial court did not abuse its discretion in admitting it. We now turn to the analysis of whether this additional relevant evidence was more prejudicial than probative.

First, we note that the testimony in question was brief, so it cannot be said to have consumed an undue amount of trial time. The entirety of Bruce's testimony, including cross-examination and redirect, is set forth on a total of 124 pages. The evidence Pryor argues should not have been admitted is covered on five of those pages.

Second, the evidence itself was unlikely to unduly prejudice the jury against Pryor. Bruce did not go into specifics about gang violence, whether within a gang or between rival gangs, so the jury was not presented with any gruesome or frightening details that might have caused them to have a negative emotional reaction to ENT and, by association, Pryor. Accordingly, the trial court did not abuse its discretion in overruling Pryor's objections under Evidence Code section 352.

### 4. *Admission of the Challenged Evidence Did Not Violate Due Process*

As to Pryor's due process challenge, the People maintain Pryor forfeited this claim by failing to assert it below. To the extent that Pryor is simply asserting that admitting the evidence "had the additional *legal consequence* of violating the federal Constitution," rather than seeking to raise new facts or legal standards which he did not raise below, we find the claim is not forfeited. (*People v. Avila*, *supra*, 38 Cal.4th at p. 527, fn. 22.) Nevertheless, we reject the argument because we find there was no error in admitting the evidence in the first place. (*People v. Garcia*, *supra*, 168 Cal.App.4th at p. 275.)

Assuming however that the trial court erred in admitting the testimony Pryor complains of, he cannot show that he was prejudiced thereby. The evidence of his participation in the home invasion robbery was overwhelming. A.W. positively

17

identified Pryor as one of the two men who entered and robbed his house that day. Within 90 minutes of that robbery, OPD tracked Pryor's phone to Oakland where Pryor, Obana, and Brown were arrested at a pawnshop where they were apparently trying to pawn items stolen from A.W.'s house. The SUV seen fleeing the scene of the Los Altos Hills robbery was parked in front of that pawnshop, and Brown had the keys to that vehicle in his pocket. The ammunition found within the SUV was of the same caliber as the weapon the robbers inadvertently left behind at A.W.'s house.

In addition, Pryor was a self-admitted ENT gang member, and in rap videos and social media posts, referenced his affiliation with ENT and disclosed his gang moniker, i.e., "Scarface," "SF," or "Lil' SF." The victims of the Newark robbery identified Brown and Pryor in court as two of the men who broke into their home. Shavies obtained a warrant to track Pryor's cell phone after recognizing him in the video surveillance associated with the Newark robbery.

Pryor points to the conflicting trial results—i.e., the jury found him guilty on the charge of active participation in a gang but was unable to reach a verdict on the gang enhancement allegations—as proof that the jurors were "frightened and confused by the improper gang evidence." These results are not mutually exclusive. There is no inconsistency in concluding, on the evidence presented, that Pryor was an active participant in ENT but committed the home invasion robbery for his personal benefit rather than to benefit the gang. As a result, we conclude the admission of the challenged evidence did not violate Pryor's due process rights.

## B. *Denial of Mistrial Motions*

Pryor next contends that the trial court erred in denying his motions for a mistrial after the prosecution's gang experts offered testimony that violated the court's in limine orders.

18

### 1. *In Limine Orders and Trial Testimony*

Before trial, the parties and the trial court discussed the appropriate limits on the prosecution's gang expert testimony pursuant to *People v. Sanchez* (2016) 63 Cal.4th 665 and *Crawford v. Washington* (2004) 541 U.S. 36. In the course of those discussions, the trial court ruled that the gang experts could testify about general background information relating to a gang, such as its primary activities, common tattoos, colors it may claim, common signs, etc., based on hearsay evidence such as investigative reports, training materials, as well as conversations with gang members and other officers. However, the trial court also ruled that the prosecution could not establish through hearsay that any specific individual—including any individuals that a purported ENT member may have been seen associating with—was in fact a member of ENT. Any such testimony would have to be based on the personal knowledge of the witness.

During trial, Shavies testified that Ronnie Flenaugh was a member of ENT "[b]ased on the fact that he committed crimes with other ENT members reported. And . . . I had observed Mr. Flenaugh on dozens of occasions in ENT territory loitering with other ENT members." The trial court sustained defendants' *Sanchez* objection and struck Shavies' testimony that he had seen Flenaugh with other gang members.

During his testimony, Marie referred to the cellphone OPD was tracking on May 11, 2015, as "Pryor's phone." Counsel's objections were sustained, and the testimony was stricken. Marie was later asked to identify the location he responded to on May 11, 2015, and he began his answer by stating "Shavies advised us that the cell phone belonging to Mr. Pryor—." Marie was cut off by the trial court directing him to "just answer what location you were advised to go to." Marie continued that he "wasn't alerted to go anywhere. . . . [O]bviously an undercover officer observed Mr. Pryor—" and his answer was cut off by counsel's objections. The trial court, impliedly sustaining those objections, said, "These last answers are stricken" and asked counsel to approach.

Brown's counsel then filed a written motion for a mistrial, joined by Pryor and Obana, arguing that the prosecution had failed to adequately admonish her witnesses to limit their testimony regarding police contacts to competent evidence as opposed to hearsay. The trial court enumerated the issues presented in the motion as: (1) Shavies' testimony that he had seen Ronnie Flenaugh in the presence of known ENT members; (2) Marie referring to the cellphone OPD was tracking as a phone belonging to Pryor rather than "associated with . . . Pryor"; and (3) Marie's testimony that he had prior contacts with Obana.[12]

The trial court denied the motion. With respect to Shavies' testimony, the trial court noted that it immediately struck that testimony on counsel's prompt objection and, under the totality of the circumstances, any prejudice to the defendants was limited because the testimony "relates to an individual who was a part of a pattern or predicate offense" and not one of the defendants. With respect to Marie's testimony about the cellphone, the trial court concluded these were "loose references" and any prejudicial effect could be easily remedied by "a . . . stipulation . . . , [or] corrected instructions." Finally, the trial court noted that Marie's testimony regarding his prior contacts with Obana were not relevant and, when the prosecution disclaimed any intent to further develop the issue, the trial court indicated it would strike that portion of Marie's testimony. Obana's counsel noted the difficulty of "pretend[ing] the bell didn't ring and [the jury] didn't hear it," but stated "I don't want to request any further remedy."

---

[12] After the trial court overruled a relevance objection interposed by Obana's counsel, Marie testified that he had personally contacted Obana "several times" prior to May 11, 2015. Outside of the jury's presence, the trial court subsequently reconsidered its ruling and struck the testimony as irrelevant. After noting that it had not struck this testimony in front of the jury, the trial court asked if any of the defendants wanted it to "affirmatively advise the jury" that this testimony was stricken or if they preferred that the testimony "just not be available . . . if [the jurors] ever wanted to look at the transcript." Counsel did not respond to the trial court's offer.

After trial resumed, Bruce testified about, among other things, his opinion that Brown was an active member of ENT.  The prosecutor asked if Brown had a moniker, and Bruce answered that he did and specified that it was "Jermo."  The trial court sustained defense counsel's hearsay objection and struck the answer.  The prosecutor then asked if Bruce had "personal knowledge" of Brown's moniker and Bruce said he did.  Bruce explained that he "was told [Brown's moniker] by two different ENT gang members."  Defense counsel's hearsay objection was sustained and, following a bench conference, the jury was excused for the day.

Outside the presence of the jury, Bruce confirmed he had been admonished by the prosecutor not to testify about "known gang members" without personal knowledge.  However, Bruce admitted he would not be able to identify the source of his personal knowledge because the gang members who had told him about Brown's moniker were confidential informants.  After excusing Bruce, the trial court advised counsel that Bruce's testimony violated its in limine ruling.  Defense counsel renewed their motion for a mistrial.

The next day, out of the presence of the jury, the trial court denied the second motion for mistrial.  After striking Bruce's testimony about Brown's moniker and admonishing the jury that it was not to consider it for any purpose, the trial court further instructed the jury that Bruce violated a court order when he offered that testimony.

### 2. *Applicable Legal Principles*

"We review the denial of a motion for mistrial under the deferential abuse of discretion standard.  [Citations.]  'A motion for mistrial is directed to the sound discretion of the trial court.  We have explained that "[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.  [Citation.]  Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." ' "

21

(*People v. Cox* (2003) 30 Cal.4th 916, 953, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

### 3. *No Abuse of Discretion in Denying Motions for Mistrial*

There was no abuse of discretion here. Counsel promptly objected to, and the trial court immediately struck, both Shavies' testimony regarding Ronnie Flenaugh and Marie's testimony about the cellphone OPD was tracking on May 11, 2015. The trial court also struck Marie's testimony about his prior contacts with Obana as irrelevant.[13] Bruce's improper testimony was also stricken, and the jury was expressly advised that Bruce violated a court order by offering that testimony. Prior to final argument, the trial court specifically instructed the jury that, in evaluating a witness' testimony, it should consider whether a witness "violate[d] a court order while giving testimony." The jury was also instructed to disregard any testimony that was stricken during trial and "not consider that testimony for any purpose."

"We presume that jurors are intelligent and capable of understanding and applying the court's instructions." (*People v. Butler* (2009) 46 Cal.4th 847, 873.) That the jury did so here is established by the fact that, despite the evidence which Pryor claims was "improper and inflammatory," the jury was still unable to reach a verdict on the gang enhancement allegations. Accordingly, the trial court did not err in denying the motions for mistrial.

### C. *Cumulative Error*

Pryor argues that even if the errors he asserts were not individually reversible, their cumulative effects prejudiced his right to a fair trial and warrant reversal. Because we find no errors, however, there is no cumulative prejudice.

---

[13] Although this took place out of the jury's presence, counsel did not take up the trial court's offer to inform the jury that the testimony was irrelevant and had been stricken.

### III.    DISPOSITION

The judgment is affirmed.

_____
Greenwood, P.J.

WE CONCUR:

_____
 Grover, J.

_____
 Danner, J.

People v. Pryor
No. H046634